```
           IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
                     ATLANTA DIVISION
```

UNITED STATES OF AMERICA     :     CRIMINAL ACTION
                                      :
       v.                          :     No. 1:10-CR-285-2-CAP-ECS
                                      :
JORGE LUIS ARCIGA-SAUCEDO     :

## REPORT AND RECOMMENDATION

### I.
### Background

This matter is before the Court on Defendant's motion to suppress evidence. [Doc. 39]. The motion came on for hearing on February 10, 2011. The hearing has been transcribed. [Doc. 50]. At the hearing, the parties stipulated that the transcript of testimony and exhibits from the hearing on the motion to suppress filed by co-Defendant Oscar Ollervides-Sanchez could be admitted in connection with this motion. [T-1:4][1] The motion has now been fully briefed. Defendant was given until April 11, 2011, to file a reply but no reply was filed. The motion is, therefore, ready for issuance of a report and recommendation.

### II.
### Summary of the Issues Presented

Defendant was pulled over on June 30, 2010, by Trooper Chris Carlisle of the Georgia State Patrol and arrested for driving

---

[1] References to the transcript of the evidentiary hearing conducted on February 10, 2011, will be indicated as: [T-1: pg. ]

without a proper license. [T-1: 10, 22]. In connection with his arrest, Defendant's person was searched and certain items were seized from his person, including a cell phone. [T-1: 24-25]. Defendant seeks to suppress the cell phone and any statements made by Defendant at the time of his arrest. [Doc. 52].

The issue boils down to whether Trooper Carlisle had probable cause to stop Defendant's vehicle. This issue, in turn, depends upon a determination as to whether the testimony of Trooper Carlisle can be credited as to the basis for the stop, namely, whether he observed Defendant's vehicle make several illegal lane changes shortly before he pulled it over on Windy Hill Road. The undersigned concludes that the Trooper's testimony was credible and that the motion should be **DENIED.**

## III.
## Facts

The undersigned incorporates the facts as found from the previous suppression hearing relating to co-Defendant Ollervides, as follows, with citations to the transcript of the previous evidentiary hearing transcript in that case:[2]

The events leading to Defendant's arrest and the search of Mr. Ollervides' truck began when a confidential source ("CS") for the

---

[2] References to the September 2, 2010, evidentiary hearing on the Ollervides motion, 1:10-CR-285, [Doc. 31], will be cited: "(T.-Pg)."

2

Drug Enforcement Administration ("DEA") agreed to introduce an undercover officer ("UC") to a contact source for the purpose of arranging the purchase of a quantity of methamphetamine. (T. 12-13). The UC made contact with the source, known as Licenciado, and arrangements were made for the purchase of two to three pounds of meth. (T. 16). The transaction was originally to occur at 4:30 on the afternoon of June 30 but was moved to between six and 6:30 in the evening. (T. 15-16).

After discussions with Licenciado, the UC was contacted through the CS by an individual later identified as co-Defendant Ollervides. (T. 17-18). A meeting was set at a Citgo station at Interstate 75 and Windy Hill Road. (T. 18). The UC and CS went to the Citgo and made contact with Ollervides. (T. 18). Defendant arrived at this meeting as a passenger in a Ford Explorer. (T. 18-19). At that meeting, Ollervides and the UC talked about locations to complete the transaction. (T. 22-23). The UC also had conversations with Licenciado during this time. (T. 23-24). At the Citgo, Ollervides asked the UC and the CS to follow him to get the drugs, but the UC declined, for safety reasons, to agree to this. (T. 22-23, 42). At this meeting, Ollervides was wearing the distinctive turquoise blue shirt that he wore throughout the events of that day. (T. 19).

Eventually, it was agreed that the transaction would be completed at Wendy's on Windy Hill not far from the Citgo. (T. 24-

3

25). Licenciado advised the UC that Ollervides would be driving a Ford pickup to the delivery and, speaking in code, told the UC that the drugs would be in a washing machine in the back of the truck.[3] (T. 25).

Ollervides left the Citgo in the Ford Explorer and went to a nearby apartment at the Grand Villas where he and an individual in a gray shirt exited the vehicle and entered the apartment for a brief time and then returned to the Ford Explorer and drove to a Wal-Mart. (T. 47-48). Defendant Ollervides was still wearing the turquoise shirt. (T. 48). After the trip to the Wal-Mart, the Ford Explorer left and went to another apartment complex where it stopped and Ollervides got out and went into the woods at a tree line, then returned to the Ford Explorer and departed. (T. 48-49). The vehicle then proceeded to a "Super Mercado" nearby on Terrell Mill Road. (T. 49). The individual with the gray shirt was still driving. (T. 49-50). Ollervides was the front seat passenger. The vehicle then returned to the Grand Villas apartment and the two individuals spent about a half an hour there. (T. 50). All of these comings and goings were monitored by law enforcement surveillance.

---

[3] Licenciado: "Pick up the 'clothes' [drugs] to wash and make sure 'soap' [money] is in there." (T. 25).

4

Still under surveillance, the two then emerged from the apartment and Ollervides, still wearing the turquoise shirt, drove a red Ford 150 pickup out of the apartment complex followed by the Ford Explorer. (T. 50-51). During this time, the UC received a call advising him that Ollervides was en route to Wendy's bringing the meth. (T. 51). Both vehicles were under surveillance during this time. (T. 51-52). With the assistance of the Georgia State Patrol, the black Ford Explorer was pulled over on its way to the Wendy's, just shy of the meeting place. (T. 52-54). The red Ford pickup proceeded to the Wendy's and pulled into a parking space. (T. 54). Ollervides got out, wearing the turquoise shirt. (T. 54). He looked around, back toward where the Ford Explorer should have been following him. (T. 54-55). He spoke on his phone. (T. 115). According to the officers, he looked confused. (T. 115).

After walking around a bit, Ollervides crossed the five lanes of Windy Hill Road and appeared to be leaving the scene. (T. 55, 77). He was arrested in the vicinity of the Chick fil-A across Windy Hill from the Wendy's where the truck was parked. (T. 77, 89). DEA Task Force Officer Gerald Dyar made the arrest. (T. 89, 104). Upon his arrest, Ollervides was placed in handcuffs and searched. (T. 104). Several items were taken from his person, including the mobile phones, some cigarettes, a statuette, a pen, his wallet and certain other items. (T. 90). He also had the keys

to the Ford pickup, (T. 79), which turned out to be registered in his name. (T. 64). He was then taken back across the street to the Wendy's. (T. 106-107). He was given Miranda[4] warnings at Wendy's. (T. 106).

By the time Ollervides arrived back across the street, another officer had already leaned into the bed of the truck and opened the top of the washing machine. (T. 100, 116). Inside he found a plastic bag or bags containing a white substance that field-tested positive for methamphetamine. (T. 110, 120, 126).

DEA Task Force Agent Geoff Furman, who had been the surveillance coordinator for the operation, prepared affidavits for search warrants pertaining to the mobile phones. (T. 58). Applications were presented to United States Magistrate Judge Linda Walker for warrants to search the phones and Judge Walker signed the warrants. (T. 58-60); [Gov. Exhs. 3-4].

The additional facts developed at the hearing conducted on the instant motion came from the vantage point of Georgia State Trooper Chris Carlisle, who testified regarding events leading to the stop. He testified that he worked with the HIDTA Drug Task Force on the day in question and that sometime around 9:30 in the evening he was

---

[4] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602 (1966).

6

asked by Task Force agents to develop probable cause and make a traffic stop on a vehicle. [T-1: 11-12].

The Task Force agents had the subject vehicle under surveillance by air and on the ground and relayed the vehicle's location to Trooper Carlisle. [T-1: 12]. Trooper Carlisle followed the directions of the agents and first made visual contact somewhere on The Exchange Street off of Tilly Mill Road, as marked on defendant's Exhibit 1. See also [T-1: 12, 14-15].

The trooper testified that once he turned on to South Park Place he observed the subject vehicle make several lane change violations. [T-1: 15-16, 37, 39-40]. During cross examination, Trooper Carlisle was less certain, after he reviewed the aerial video of the pursuit and stop, as to whether he observed the lane changes after he turned on South Park, or before, on The Exchange. [T-1: 70-71]. Nevertheless his testimony was unequivocal that he saw the vehicle change lanes illegally at least three times, even after counsel's thorough and sifting cross-examination on the subject. [T-1: 60, 69]. He described in some detail how these lane change violations occurred. [T-1:15-16].

After observing the violations, and after the Defendant's vehicle made a left turn onto Windy Hill Road, Trooper Carlisle activated his blue lights and pulled Defendant over. [T-1: 17-18]. After making the stop, the trooper ascertained that Defendant did

7

not have a valid driver's license and placed Defendant under arrest. [T-1: 22, 29].  Trooper Carlisle impounded the vehicle, took an inventory of the property, placed all of Defendant's personal property, including a cell phone, in a personal inventory bag, and turned the vehicle over to the wrecker service.  [T-1: 24-25, 66]. The Trooper's best recollection after reviewing the video recording from the camera on his cruiser's dashboard was that he took the cell phone from Defendant's person. [T-1: 25-26, 53-54, 67].

The government was allowed to supplement the record after the hearing with a copy of its policy manual on the removal of abandoned and unattended vehicles. <u>See</u> [Gov. Ex. 18].

## IV.
## Discussion

A law enforcement official may stop a vehicle if there is probable cause to believe that the driver is violating a traffic law or regulation.  <u>United States v. Cooper</u>, 133 F.3d 1394, 1398 (11th Cir.1998) ("[L]aw enforcement may stop a vehicle when there is probable cause to believe that the driver is violating any one of the multitude of applicable traffic and equipment regulations relating to the operation of motor vehicles.") (internal quotation marks omitted).  Under Georgia law, it is a violation of the Uniform Rules of the Road to change lanes "without giving an appropriate and

8

timely signal in the manner provided by law."  O.C.G.A. § 40-6-123(a).[5]

In this case, Trooper Carlisle testified unequivocally that he observed Defendant's vehicle change lanes on at least three occasions without giving an appropriate signal. [T-1: 14-15].  The aerial surveillance does not contradict Trooper Carlisle's testimony that lane changes occurred on South Park, as he initially testified. On cross examination, counsel for Defendant was able to cast some doubt on Trooper Carlisle's testimony regarding exactly where on the road he observed the unsignaled lane changes, but this equivocation is not enough for the Court to conclude that Trooper Carlisle was not telling the truth when he stated that he saw the violations. Consequently, the undersigned concludes that Trooper Carlisle had probable cause to stop Defendant's vehicle when he pulled it over after it made a left turn onto Windy Hill Road.

The stop being valid, the subsequent arrest of Defendant for failure to have a valid driver's license was likewise valid,[6] and the search of Defendant's person and the seizure of, among other things,

---

[5] Under O.C.G.A. § 40-6-123(b), "A signal of intention to turn right or left or change lanes when required shall be given continuously for a time sufficient to alert the driver of a vehicle proceeding from the rear in the same direction or a driver of a vehicle approaching from the opposite direction."

[6] Defendant does not challenge the validity of the arrest itself, independent of the stop.

9

his cell phone, was also valid as a search incident to his arrest.[7] See generally United States v. Robinson, 414 U.S. 218, 235 (1973)("It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment.").

## V.
## Conclusion

The undersigned concludes for the reasons stated above that Defendant's motion to suppress, [Doc. 39], should be **DENIED**.

It appearing that there are no further pretrial or discovery matters to bring before the undersigned as to either defendant, it is therefore **ORDERED** that this **CASE** be and is hereby **CERTIFIED** as ready for trial.

---

[7] At the evidentiary hearing, Trooper Carlisle expressed some uncertainty about whether the cell phone was taken from Defendant's person or was seized from the console of the vehicle. After a review of the dashboard camera video and consideration of the testimony as a whole, the undersigned concludes that Trooper Carlisle seized the cell phone from Defendant's person. But even if the phone was retrieved from the console, it appears that the seizure of the phone would have been valid as an inventory search conducted under the impound policy followed by the Georgia Department of Public Safety. See Gov't Ex. 18. See generally, Colorado v. Bertine, 479 U.S. 367, 372 (1987).

**SO REPORTED AND RECOMMENDED,** this 12th day of May, 2011.

>   */s/ E. Clayton Scofield III*
>   E. Clayton Scofield III
>   UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)